**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Kossivi Agdedidi Midodji,

Petitioner,

v.

Eric Rokosky, et al.,

Respondents.

No. CV-26-03054-PHX-DJH (DMF)

**ORDER**

Petitioner Kossivi Agdedidi Midodji, a Benin citizen, has been held in immigration detention at the Eloy Detention Center since December 18, 2024. He filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241, contending that his detention, now more than twenty-one months without a determination by a neutral decisionmaker with authority to release him, violates the Due Process Clause of the Fifth Amendment.[1] (Doc. 1.) Respondents filed a Response (Doc. 9) and, at the Court's direction (Doc. 15), a Supplemental Response addressing *Padilla v. U.S. Immigration & Customs Enforcement*, No. 24-2801, 2026 WL 2822044 (9th Cir. Sept. 21, 2026) (Doc. 18). Petitioner filed a Reply (Doc. 10) and a Supplemental Response (Doc. 21). For the reasons stated herein Respondents will be required to release Petitioner under the stated conditions because his detention has become unreasonably prolonged.

## I. Background

[1] Petitioner challenges his detention on procedural due process (Count I) and substantive due process (Count II) grounds. Because the Court decides the issue on procedural due process grounds, the Court will deny Count II as moot.

Petitioner entered the United States near Mariposa, Arizona, at approximately 3:00 p.m. on December 18, 2024, "without being inspected by an immigration officer at a designated Port of Entry." (Doc. 9-1 at 4.) Border Patrol agents encountered him near Mariposa at approximately 7:49 p.m. that evening, apprehended him with a group of seventeen people, and transported him to a Border Patrol facility in Tucson. (*Id.* at 3-4.) Petitioner's Form I-213 reflects that Petitioner was processed for expedited removal because he "was apprehended within fourteen days of [his] last entry into the United States, and within 100 air miles of any United States land border." (*Id.* at 4.)

After an asylum officer found that Petitioner had a credible fear of persecution, the expedited removal order was vacated and Department of Homeland Security ("DHS") served a Notice to Appear ("NTA") placing him in full removal proceedings under 8 U.S.C. § 1229a. (Doc. 1-1 at 29.) The NTA does not designate Petitioner as an arriving alien; DHS left unchecked the box stating "You are an arriving alien" and instead checked the box designating him "an alien present in the United States who has not been admitted or paroled."[2] (*Id.*)

On September 17, 2025, an Immigration Judge ("IJ") denied Petitioner asylum and withholding of removal but granted deferral of removal under the Convention Against Torture ("CAT").[3] (Doc. 1-1 at 33-36.) According to the Petition, the IJ found him credible and concluded that he would qualify for asylum but for the material-support bar, 8 U.S.C. § 1182(a)(3)(B), which the IJ applied because of a ransom payment made to secure Petitioner's release from kidnappers in Mexico. (Doc. 1 ¶¶ 24-25.) DHS waived appeal. (Doc. 1-1 at 36.) Petitioner appealed, and the Board of Immigration Appeals ("BIA") accepted the appeal as timely on November 10, 2025, and stated that "[a] briefing schedule will be set." (*Id.* at 46.) As of the filing of the Petition, no briefing schedule had issued.[4]

---

[2] The NTA alleged that he "entered the United States at an unknown location on or about 2024-12-18" and charged him as removable under INA §§ 212(a)(6)(A)(i) and 212(a)(7)(A)(i)(I). (Doc. 1-1 at 29.)

[3] The IJ's order states that removal is deferred to "Jordan." (Doc. 1-1 at 36.) Petitioner is a citizen of Benin, the order directs removal in the alternative to Benin (*id.* at 35), and Petitioner's notice of appeal asks the BIA to correct what appears to be a typographical error (*id.* at 43).

[4] Respondents' initial Response states that Petitioner's asylum application "is currently

(Doc. 1 ¶ 27.)

On April 15, 2026, an IJ held a custody redetermination hearing. The IJ denied bond for lack of jurisdiction, concluding that Petitioner is subject to mandatory detention under *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). (Doc. 1-1 at 48.) In the alternative, the IJ stated that he "would grant bond in the amount of $8,500.00 with alternatives to detention at the discretion of DHS." (*Id.*) DHS waived appeal. (*Id*. at 49.) Petitioner represents—and Respondents do not dispute—that he has asked DHS to parole him and that DHS has not responded to that request. (Doc. 1 ¶ 66.)

In response to the Petition, Respondents argue that Petitioner must first appeal his bond denial to the BIA; that his detention is mandated by 8 U.S.C. § 1225(b); and that, as an "arriving alien" subject to the entry fiction recognized in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), he has no due process rights regarding his detention beyond those Congress has conferred by statute. (Doc. 9 at 2-5; Doc. 18 at 1-2, 6-8.) The Court will address each contention.

## II. Exhaustion

Respondents first argue that the Petition should be dismissed because he did not appeal the April 15, 2026 bond decision to the BIA. (Doc. 9 at 2-3.) No statute requires exhaustion here, so the requirement is prudential. *See Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). A court may require prudential exhaustion if "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (citation omitted). Even when those factors are present, a court may waive exhaustion where "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d

being considered by the Ninth Circuit Court of Appeals." (Doc. 9 at 3.) The record reflects that his appeal is pending before the BIA. (Doc. 1-1 at 46.)

994, 1000 (9th Cir. 2004) (citation omitted).

None of the *Puga* factors supports exhaustion here. The IJ did not exercise discretion or make operative findings for the BIA to review. Rather, he concluded that the IJ lacked jurisdiction because *Matter of Yajure Hurtado*, a precedential BIA decision, subjects Petitioner to mandatory detention. (Doc. 1-1 at 48.) The BIA would also be bound by the Attorney General's decision in *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), which holds that noncitizens transferred from expedited removal to full proceedings after a positive credible fear finding are ineligible for bond. An appeal therefore could not compel a different result. And requiring Petitioner to ask the BIA to disregard its own precedent is a "futile gesture." *Laing*, 370 F.3d at 1000.

Respondents' own position confirms this conclusion. They maintain that Petitioner's detention is "statutorily mandated" and that the statute "explicitly does not provide for a bond hearing." (Doc. 9 at 3.) Respondents' simultaneous insistence that the agency lacks authority to release Petitioner but that he must first ask the agency to release him is nonsensical. For the same reason, their suggestion that Petitioner "is also able to request a second bond hearing" (*id.*) offers nothing: the IJ remains bound by *Yajure Hurtado* and/or *Matter of M-S-*.

The BIA also cannot decide the claim Petitioner presents. He contends that the Due Process Clause requires a hearing that the statute, as the agency construes it, does not provide. The BIA lacks authority to rule on the constitutionality of the statutes it administers. *See Matter of C-*, 20 I. & N. Dec. 529, 532 (BIA 1992). The rule Respondents invoke requires exhaustion of constitutional claims only "when those claims are reviewable by the BIA on appeal." (Doc. 9 at 2 (quoting *Rojas-Garcia v. Ashcroft*, 339 F.3d 814, 819 (9th Cir. 2003)).) This one is not.

*Leonardo* does not suggest otherwise. It involved a detainee who sought district court review of the result of a bond hearing that the IJ had authority to conduct and decide. 646 F.3d at 1159-61. Respondents' concern about detainees "who disagree with their bond outcome" bypassing the BIA (Doc. 9 at 2) is likewise misplaced. Petitioner does not

disagree with a discretionary bond outcome; the IJ stated he would grant bond but for the lack of jurisdiction. The only obstacle to release is a legal rule the agency has announced and will not revisit.

Finally, irreparable injury independently warrants waiver. Petitioner has been detained for more than twenty-one months with serious and unrebutted medical conditions. (Doc. 1-1 at 8-10, 18.) The record does not reflect that the BIA has set a briefing schedule on his merits appeal. (*Id.* at 46; Doc. 1 ¶ 27.) Requiring a further administrative appeal would add delay with no prospect of relief. *See Laing*, 370 F.3d at 1000; *Hernandez v. Sessions*, 872 F.3d 976, 994-95 (9th Cir. 2017). Exhaustion is excused.

## III. The Due Process Clause Applies to Petitioner's Detention

### A. Governing Principles

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). That protection extends to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693; *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). Civil detention is permissible only in narrow circumstances and only with adequate procedural protections. *See Zadvydas*, 533 U.S. at 690; *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Its "nature and duration" must "bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

Immigration detention serves two legitimate purposes: ensuring the noncitizen's appearance and protecting the community. *Zadvydas*, 533 U.S. at 690-91. Those purposes justify detention only insofar as detention actually serves them for the person detained. As detention lengthens, the liberty interest at stake grows, and so does the need for an individualized assessment.

Unless Petitioner falls wholly outside the Due Process Clause's protection, his

prolonged detention without any such assessment is subject to these constraints. Respondents contend that he is within "the narrow category of people covered by the entry fiction" and "therefore, is not entitled to the Fifth Amendment's guarantee of due process." (Doc. 18 at 8; *see* Doc. 9 at 3-5.) The Court rejects that contention for several independent reasons.

**B. Petitioner Is Not an "Arriving Alien"**

The premise of Respondents' argument is that Petitioner is an "arriving alien." (Doc. 18 at 2, 3, 7, 8.) He is not. By regulation, an arriving alien is "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. §§ 1.2, 1001.1(q); *see Padilla*, 2026 WL 2822044, at *3.

Respondents' own facts shows that Petitioner did not come into the United States at a port of entry. He "entered the United States on December 18, 2024, without inspection, admission, or parole," and was "encountered by Border Patrol" hours later. (Doc. 18 at 2 (citing Doc. 9-1 at 2-4).) The I-213 on which Respondents rely states that Petitioner crossed the boundary "without being inspected by an immigration officer at a designated Port of Entry." (Doc. 9-1 at 4.) Consistent with that history, DHS did not designate Petitioner an arriving alien in his NTA. It left unchecked the box for "You are an arriving alien," designated him "an alien present in the United States who has not been admitted or paroled," and charged him under INA § 212(a)(6)(A)(i) as present without admission or parole.[5] (Doc. 1-1 at 29.)

Respondents' initial Response says that because Petitioner "entered the United States and was immediately apprehended," he is "an applicant for admission." (Doc. 9 at 3, 5.) That may be true, but it does not make Petitioner an arriving alien. Every noncitizen "present in the United States who has not been admitted" is deemed an applicant for admission, wherever and whenever apprehended. 8 U.S.C. § 1225(a)(1). Every member

---

[5] Respondents note that the Mariposa Port of Entry is the principal crossing in Nogales. (Doc. 18 at 2 n.1.) That does not change the Court's analysis. Being apprehended somewhere "near Mariposa, AZ" is not the same as presenting at a port of entry or being encountered at one. Respondents do not contend that Petitioner did either. The NTA alleges that he entered "at an unknown location." (Doc. 1-1 at 29.)

of the *Padilla* class was therefore an applicant for admission too, and the Ninth Circuit nonetheless held that the class may assert due process rights regarding detention. Status as an applicant for admission, therefore, is not dispositive as to the application of the entry fiction. The regulatory definition of "arriving alien" identifies the relevant subset: applicants who come or attempt to come in at a port of entry.

Nor does Petitioner's placement in expedited removal ipso facto make him an arriving alien. Expedited removal applies to two groups. The first is arriving noncitizens. 8 U.S.C. § 1225(b)(1)(A)(i). The second is "certain other" noncitizens who have not been admitted or paroled and whom the Secretary has designated. *Id.* § 1225(b)(1)(A)(iii); *see Padilla*, 2026 WL 2822044, at *3. When Petitioner was apprehended, that designation covered noncitizens encountered within 100 air miles of the border who could not show fourteen days of continuous presence. Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004). The I-213 invokes that designation. (Doc. 9-1 at 4.) Petitioner entered without inspection and was apprehended by Border Patrol, so he falls in the second category, not the first.

The mislabeling carries over to Respondents' statutory theory. Initially, Respondents asserted that Petitioner is subject to mandatory detention under § 1225(b)(1)(B)(ii) "while his asylum application is considered." (Doc. 9 at 3.) Then in their Supplemental Response they assert that Petitioner is "properly detained under Section 1225(b)(2)(A), not 1226(a)." (Doc. 18 at 2, 7.) But as *Padilla* explains, a noncitizen who is screened for expedited removal and then moved into full removal proceedings after a positive credible fear determination is detained under § 1225(b)(1)(B)(ii). *Padilla*, 2026 WL 2822044, at *4. *Padilla* does not address § 1225(b)(2)(A). So,, nothing *Padilla* supports the conclusion that Petitioner is detained under that provision. Indeed, Respondents are mistaken that Petitioner is unlike the *Padilla* class members. (Doc. 18 at 2-3.) The Ninth Circuit described the class as asylum seekers with these features: (1) they entered without inspection; (2) they were screened for expedited removal; (3) they received positive credible fear determinations; (4) they were placed in full removal proceedings; and

(5) they are detained under § 1225(b)(1)(B)(ii) without a bond hearing. *Padilla*, 2026 WL 2822044, at *5. Each feature describes Petitioner. The April 15, 2026 proceeding does not change that, because the IJ concluded he had no jurisdiction to grant bond. Respondents rely on the class's exclusion of individuals encountered at a port of entry, *id.* at *13, but that exclusion does not reach Petitioner. He was not encountered at a port of entry. So, Petitioner should qualify as a member of the *Padilla* class.

### C. *Padilla* Holds That *Thuraissigiam's* Limitation Does Not Reach Detention Claims

There is an independent ground that does not depend on where or when a noncitizen was apprehended. Even assuming that Petitioner's apprehension within hours of crossing placed him on "the threshold of initial entry" for purposes of admission, Respondents' conclusion that he is not entitled to due process protection does not follow. Respondents read *Padilla's* statement that "[n]oncitizens who arrive illegally and are found away from the border well after arrival are protected from arbitrary detention" as a limit on its holding. (Doc. 18 at 1-3, 6 (quoting *Padilla*, 2026 WL 2822044, at *19).) But that sentence describes the class before the court. It does not say that everyone outside the class lacks due process rights regarding detention. That issue was not before the court.

Respondents also strongly rely on the Supreme Court's statement in *Thuraissigiam* that "an alien in respondent's position has only those rights regarding *admission* that Congress has provided by statute." 591 U.S. at 140 (emphasis added). The petitioner there challenged the procedures used to deny him admission, specifically the unavailability of judicial review of a negative credible fear determination. He did not seek release from custody. *Id.* at 115, 117-18. Section II.B.2 of *Padilla* rests on that distinction. The Ninth Circuit explained that *Thuraissigiam* addressed a due process claim concerning admission. It contrasted the political branches' plenary power over admission with the government's historically limited authority to detain, a limit the Ninth Circuit traced back to Magna Carta. And it concluded that "*Thuraissigiam* was an admission, not a detention, case." *Padilla*, 2026 WL 2822044, at *19. The court treated that distinction as an independent reason

*Thuraissigiam* does not govern a due process challenge to detention. It operates in addition to, not as a subset of, *Thuraissigiam's* limitation to noncitizens at the threshold of entry. *Id.*

Moreover, Section II.B.2 is binding—two members of the panel joined it. One Judge joined the opinion and wrote separately only to explain that she would not have reached the issue. *Id.* at *19 (Friedland, J., concurring in part). An alternative ground is not dicta for that reason. When a panel confronts an issue germane to the resolution of the case and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit. *Barapind v. Enomoto*, 400 F.3d 744, 750-51 (9th Cir. 2005) (en banc) (per curiam).

Respondents mention this part of *Padilla* only in passing. They say the Ninth Circuit distinguished *Thuraissigiam* because it "involved admission into the country versus detention as it related to individuals who had gained entry." (Doc. 18 at 5.) That statement cannot be found by the Court in the opinion. In addition, Respondents' own quotations undercut their reading. The passages they quote from *Alimov v. Mullin*, No. CV-26-03690-PHX-JJT, 2026 WL 2979541, at *1-2 (D. Ariz. Oct. 5, 2026), which in turn quotes *Padilla*, describe the entry fiction as limiting due process rights "regarding admission." (Doc. 18 at 7.) And *Padilla* relied on *Zadvydas* for the point that even noncitizens with final removal orders, who have no right to remain in this country, keep their constitutional rights regarding confinement. *Padilla*, 2026 WL 2822044, at *19. That reliance simply cannot be reconciled with Respondents' position that lacking a right to be admitted means lacking any constitutional protection against arbitrary detention.

Respondents emphasize that the Ninth Circuit never concluded or suggested that an arriving alien seeking release has rights beyond those Congress confers. (Doc. 18 at 5-6.) Yet, the class before the court excluded arriving aliens—so it would have been an advisory opinion to decide an issue not before the court. Because Petitioner is not an arriving alien, the argument is not well taken.

The Ninth Circuit's post-*Thuraissigiam* decisions confirm the pattern. Two cases

applied the entry fiction to noncitizens apprehended immediately after crossing, and each involved a challenge related to admission. *Guerrier v. Garland*, 18 F.4th 304 (9th Cir. 2021), concerned the lack of counsel at a credible fear interview. *Mendoza-Linares v. Garland*, 51 F.4th 1146 (9th Cir. 2022), concerned review of a negative credible fear determination. *See Padilla*, 2026 WL 2822044, at *13. Respondents cite no authority applying the entry fiction to bar a detention-related due process claim by a noncitizen who entered without inspection, and the Court is aware of no binding authority that does so.

Respondents' initial Response goes further. It asserts that the Supreme Court "has explicitly held that section 1225(b)(1)'s mandatory detention without bond does not violate the Due Process Clause." (Doc. 9 at 4 (citing *Thuraissigiam*, 591 U.S. at 107).) Not so. The cited page introduces the Court's resolution of a challenge to the limits on judicial review of an expedited removal order. *Thuraissigiam* nowhere decides whether detention under § 1225(b)(1) comports with due process. Respondents' Supplemental Response itself observes that the petitioner there did not dispute the lawfulness of his confinement. (Doc. 18 at 4 n.4 (citing 591 U.S. at 118-19).) That observation confirms the point: because no detention claim was before the Court, *Thuraissigiam* decided nothing about one.[6]

**D. Even If the Entry Fiction Applied, It Would Not Foreclose Petitioner's Claim**

Notwithstanding the foregoing, even if Petitioner were treated as standing on the threshold of initial entry, the result would be the same. *Padilla's* admission-versus-detention holding is sufficient on its own. The Court also concludes that the authorities on which Respondents rely do not establish that a noncitizen subject to the entry fiction may be held for a prolonged period with no individualized review at all.

**1. *Thuraissigiam* Governs Admission Procedures, Not Prolonged Detention**

Respondents rely on the statement that a noncitizen in Thuraissigiam's position "has

[6] Counsel for Respondents has been repeatedly reminded about the accuracy of statements of law made in filings with the Court. Counsel should not continue to misrepresent the scope of decisions. Further failure to heed these warnings may result in sanctions under Federal Rule of Civil Procedure 11.

only those rights regarding admission that Congress has provided by statute." 591 U.S. at 140. *See also* Doc. 9 at 5; Doc. 18 at 4. But, again, that holding is expressly limited to rights "regarding admission." Thuraissigiam challenged the procedures used to reject his credible-fear claim, which is a challenge to the admission determination itself. 591 U.S. at 138-40. He did not challenge his detention, and the Court did not decide any question about detention.

Indeed, the Court's Suspension Clause holding turned on that very distinction. The Court explained that habeas historically secured release from unlawful custody, and that Thuraissigiam sought something different: further review of his asylum claim and, ultimately, authorization to remain. *Id.* at 117-19. The decision thus treats release from custody and admission as distinct; here Petitioner seeks only the former.

To reiterate: release is not admission as a matter of statute. A noncitizen paroled under § 1182(d)(5) "shall not be considered to have been admitted." 8 U.S.C. § 1101(a)(13)(B); *see id.* § 1182(d)(5)(A). *Thuraissigiam* itself recognizes that arriving aliens paroled into the country, even for years, are still treated "as if stopped at the border." 591 U.S. at 139 (citation omitted). Respondents make the same point. (Doc. 18 at 4 n.3 (citing *Lopez-Sorto v. Garland*, 103 F.4th 242, 252 (4th Cir. 2024), and *Romero v. Garland*, 999 F.3d 656, 661 (9th Cir. 2021)).) But the point cuts against them. The entry fiction preserves Congress's authority over admission wherever the noncitizen physically waits. Release on bond would not disturb that authority, so the fiction supplies no reason to deny a liberty interest in freedom from prolonged confinement.

Respondents' position that detention "for further consideration of the application for asylum" is part of the admission process, and that a noncitizen who has not established a right to be admitted "cannot be said to have a due process right to release into the interior" (Doc. 9 at 4-5), seems indefensible. If detention for that purpose were constitutionally immune, Congress could authorize detention of any length, under any conditions, as a necessary condition of admission. But Respondents do not—and indeed could not—defend that proposition.

Petitioner's posture also differs from Thuraissigiam's. Thuraissigiam failed his credible-fear screening and sought more review of that threshold determination. Petitioner passed his screening and was placed in full removal proceedings under 8 U.S.C. § 1229a, the same proceedings used for noncitizens arrested in the interior. (Doc. 1-1 at 29.) His appeal has been pending before the BIA since October 2025, and the record does not reflect that a briefing schedule has been set. (*Id.* at 46; Doc. 1 ¶ 27.) The length of Petitioner's detention flows from adversarial proceedings and administrative appeal times within the government's control, not from a threshold screening Congress designed to be brief.

**2. *Knauff, Mezei, Kaplan, Nishimura Ekiu,* and *Barrera-Echavarria***

Respondents also rely on *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), and three other Supreme Court cases: *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953); *Kaplan v. Tod*, 267 U.S. 228 (1925); and *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892). (Doc. 9 at 3-4; Doc. 18 at 6.) These cases do not change the result.

Each involved a noncitizen who arrived at a port of entry and was held, or allowed ashore, in connection with the decision whether to admit or exclude that person. That is the traditional core of the entry fiction, which, as *Padilla* explains, historically applied only to individuals encountered by immigration officials at a port of entry. *Padilla*, 2026 WL 2822044, at *13. Petitioner is not such an individual. *Knauff's* statement that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned," 338 U.S. at 544, addressed the procedure for denying entry, which is a question of admission and not detention.

The only decision Respondents cite that applies the entry fiction to someone who did not arrive at a port of entry is *Thuraissigiam*. The Ninth Circuit described that extension as "a tiny bit," *Padilla*, 2026 WL 2822044, at *13, and the Supreme Court expressly confined its holding to rights "regarding admission," 591 U.S. at 140. Respondents' argument therefore requires combining two things: the detention setting of the port-of-entry cases, and *Thuraissigiam's* narrow extension of the fiction to unlawful entrants. Neither

*Thuraissigiam* nor *Padilla* endorses that combination, and *Padilla's* admission-versus-detention holding forecloses it. *See also Zadvydas*, 533 U.S. at 692-94 (distinguishing *Mezei*).

Respondents' descriptions of *Kaplan* and *Nishimura Ekiu* confirm the point. They describe *Kaplan* as involving "nine years' detention at Ellis Island." (Doc. 18 at 6.) Not so. The petitioner there was held at Ellis Island for about a year and then released to an immigrant aid society, which allowed her to live with her father in the United States for years. The question was whether that period of release counted as "dwelling in the United States" for purposes of derivative naturalization. 267 U.S. at 229-30. *Kaplan* thus illustrates what the entry fiction does (and by extension what it does not): it prevents release from ripening into a legal admission. It says nothing about whether prolonged confinement requires a bond hearing before a neutral adjudicator. And Respondents describe *Nishimura Ekiu* as involving confinement "pending a final decision on her right to enter." (Doc. 18 at 6.) But that is a case about the initial admission process at a port of entry, not prolonged detention following an admission screening.

*Mezei* does not control either. Mezei was excluded under emergency wartime regulations, based on confidential information the Attorney General deemed prejudicial to the public interest. 345 U.S. at 208. The Court's acceptance of his confinement on Ellis Island was necessarily shaped by that national-security context. Moreover, the Supreme Court has since narrowed *Mezei*. In *Clark v. Martinez*, 543 U.S. 371, 378-86 (2005), it applied *Zadvydas's* limits on post-order detention to inadmissible Cubans and rejected the government's claim that they could be held indefinitely. *See also Xi v. INS*, 298 F.3d 832 (9th Cir. 2002). While *Clark* rested on statutory construction, it would be anomalous to protect inadmissible noncitizens against prolonged detention after a final order and not before one. Respondents themselves cite *Xi* for its description of the entry fiction (Doc. 18 at 4), but *Xi* held that the post-order detention statute does not authorize the indefinite detention of an inadmissible noncitizen.

*Mezei* is also distinguishable on its posture. Mezei was held after a final exclusion

order because no country would accept him, so his detention served to effect a completed exclusion decision. Respondents' own description confirms as much: Mezei sought release on bond "until arrangements could be made for his departure." (Doc. 18 at 6 (quoting 345 U.S. at 207).)

*Barrera-Echavarria v. Rison*, 44 F.3d 1441 (9th Cir. 1995) (en banc), does not compel a different result. Barrera-Echavarria was detained after a final exclusion order pending removal. The court predicated its holding on *Mezei* "and in light of the annual parole reviews provided under the Cuban Review Plan regulations." *Id.* at 1450. The decision stressed that Barrera-Echavarria had been considered for parole at least annually since 1985, could be assisted by a representative, and could present oral and written evidence for release. *Id.* He therefore had a yearly opportunity to show that he no longer posed a danger. Respondents offer no such facts here.

Indeed, courts applying *Barrera-Echavarria* have read it the same way. *See Chi Thon Ngo v. INS*, 192 F.3d 390, 396-99 (3d Cir. 1999) (relying on *Barrera-Echavarria* and holding that even an excludable alien's prolonged detention satisfies due process only with rigorous, individualized, periodic review of flight risk and danger); *Hoyte-Mesa v. Ashcroft*, 272 F.3d 989, 991 (7th Cir. 2001) (per curiam) (annual parole review under the Cuban Review Plan satisfies due process). These decisions treat periodic individualized review as what satisfies due process. That framing necessarily presupposes that due process requires it.

Thus, read in context, *Barrera-Echavarria* does not hold that an arriving alien may be detained for a prolonged period with no individualized review at all; it upheld post-order detention accompanied by annual, counseled, evidentiary parole reviews. The record here reflects no comparable process. Respondents' only evidentiary submission is the Form I-213 (Doc. 9-1), and nothing in the record shows that ICE has ever reviewed Petitioner's custody under 8 U.S.C. § 1182(d)(5) or 8 C.F.R. § 212.5. In addition, Petitioner represents that DHS has not responded to his parole request (Doc. 1 ¶ 66), and Respondents do not

dispute it.[7]

**3. Habeas Review Requires More Than Confirming a Statutory Classification**

*Boumediene v. Bush*, 553 U.S. 723 (2008), addressed the Suspension Clause rather than the content of due process, *id.* at 798, but its reasoning bears directly on Respondents' position. The Court refused to let the reach of constitutional limits on executive detention turn on formal legal designations. The Constitution grants the political branches "the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply." *Id.* at 765. A contrary rule would let them "switch the Constitution on or off at will." *Id.*

The entry fiction, applied to prolonged detention, works in just that way. Petitioner has been held for more than twenty-one months at the Eloy Detention Center in Eloy, Arizona, under the exclusive physical control of the United States. Treating him as constitutionally located at the border lets a legal designation decide whether the Constitution limits the deprivation of liberty actually being imposed. *Boumediene* extended constitutional protection to detainees at a leased naval base in Cuba based on the practical reality of United States control. *Id.* at 764-71. It would be anomalous to afford less to a person detained within the United States itself.

*Boumediene* also explains what habeas review requires. The habeas court must be able to assess the adequacy of the process behind the detention, and it "must have the power to order the conditional release of an individual unlawfully detained." *Id.* at 779. The Court itself measured the adequacy of the Combatant Status Review Tribunal procedures, including the detainee's ability to rebut the government's evidence. *Id.* at 783-92. If an arriving alien's detention were lawful for however long the statute authorizes, habeas review would reduce to confirming his statutory classification. That would be a check on executive detention in name only.

---

[7] To the extent *Ibarra-Perez v. Howard*, 468 F. Supp. 3d 1156, 1175-76 (D. Ariz. 2020), describes *Barrera-Echavarria* as approving detention while asylum or removal proceedings are pending, it omits both the post-order posture and the review mechanism on which the en banc court relied.

*Kiyemba v. Obama*, 555 F.3d 1022 (D.C. Cir. 2009), *vacated*, 559 U.S. 131 (2010) (per curiam), *reinstated as amended*, 605 F.3d 1046 (D.C. Cir. 2010), is not to the contrary. *Kiyemba* held that courts could not order detainees held abroad brought into the United States. 605 F.3d at 1048. That remedy would have effected entry in the literal sense, and resettlement in third countries remained available. But Petitioner is already in the United States. Release from the Eloy Detention Center would move him across no border and confer no admission. *See* 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).

**4. Limits on Conditions of Confinement Confirm That Due Process Applies**

Taken literally and to its logical conclusion, Respondents' position that Petitioner "is not entitled to the Fifth Amendment's guarantee of due process" (Doc. 18 at 8) would likewise leave him unprotected against punitive conditions. Respondents do not contend that a noncitizen in immigration detention may be punished, abused, or denied necessary medical care. Nor could they. Since *Wong Wing*, the Supreme Court has distinguished detention "as part of the means necessary to give effect to" exclusion or expulsion, which is permissible, from punishment, which requires full constitutional process even for noncitizens subject to removal. 163 U.S. at 235-38. Courts applying the entry fiction have held that it does not strip detained excludable aliens of protection against physical abuse. *Lynch v. Cannatella*, 810 F.2d 1363, 1373-75 (5th Cir. 1987); *see also Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004) (treating the entry fiction as a narrow doctrine concerned chiefly with admission and exclusion procedures).

That limit defeats the categorical premise. If the Due Process Clause protects detained noncitizens within the entry fiction against punitive conditions, it cannot be true that they hold no constitutional rights beyond those Congress grants. The question then becomes the ordinary one: once due process applies, what process is due. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

The anti-punishment principle itself reaches duration. *Wong Wing* approved detention only as a means "necessary" to carry out exclusion or expulsion. 163 U.S. at 235.

Civil confinement whose "nature and duration" no longer bear a reasonable relation to its purpose exceeds constitutional bounds. *Jackson*, 406 U.S. at 738. A restriction excessive in relation to its non-punitive purpose may be found punitive. *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979). Detention that continues for more than twenty-one months with no one determining whether it still serves its purposes for this detainee risks becoming exactly that. Indeed, it would make little sense for the Constitution to protect a detainee against inadequate food or medical care but not against more than twenty-one months of confinement without a hearing. Confinement is the greater deprivation and cannot receive less protection than the conditions that accompany it.

### E. *Demore*, *Jennings*, and the Remaining Contrary Authority

*Demore v. Kim*, 538 U.S. 510 (2003), supports Petitioner's claim. The Court upheld mandatory detention "for the brief period necessary for [the alien's] removal proceedings," relying on data that such detention typically lasted about a month and a half, and about four months more when the alien appealed. *Id.* at 513, 529-30. Petitioner has been detained for more than twenty-one months, much more than the period *Demore* contemplated.

Respondents assert that *Jennings v. Rodriguez*, 583 U.S. 281, 296-303 (2018), held that detention under § 1225(b)(2)(A) "is not unconstitutionally indefinite." (Doc. 18 at 7 n.5; *see* Doc. 9 at 4.) But *Jennings* held no such thing. It decided a question of statutory interpretation: §§ 1225(b)(1) and (b)(2) require detention until proceedings are complete and contain no implied time limit or bond-hearing requirement. 583 U.S. at 296-303. The class there included noncitizens detained under § 1225(b), and the Court expressly declined to reach their constitutional arguments, remanding for the Ninth Circuit to address them in the first instance. *Id.* at 312. Nothing in *Jennings* suggests those claims were foreclosed by *Mezei* or the entry fiction. *Jennings* expressly left the constitutional question open, and *Padilla* holds that it may be litigated.

The Court acknowledges that some courts have held that arriving aliens have no due process right to a bond hearing during prolonged detention. *See, e.g., Ibarra-Perez*, 468 F. Supp. 3d at 1175-77; *Mamedova v. Noem*, No. CV-25-04619-PHX-DWL, 2026 WL

1162282, at *3 (D. Ariz. Apr. 29, 2026); *Sierra v. INS*, 258 F.3d 1213, 1218 (10th Cir. 2001). As *Mamedova* itself recognized, those decisions represent one side of a split, and perhaps not the majority. 2026 WL 1162282, at *3. *See, e.g., Zhu v. Noem*, No. CV-26-01734-PHX-JJT (CDB) (D. Ariz. June 8, 2026), *report and recommendation adopted*, 2026 WL 2029970 (D. Ariz. July 14, 2026); *Kaur v. Lyons*, No. CV-26-00217-PHX-KML (ASB), 2026 WL 967846, at *4-6 (D. Ariz. Mar. 24, 2026), *report and recommendation adopted*, 2026 WL 963792 (D. Ariz. Apr. 9, 2026); *Banda v. McAleenan*, 385 F. Supp. 3d 1099 (W.D. Wash. 2019); *Kydyrali v. Wolf*, 499 F. Supp. 3d 768, 772 (S.D. Cal. 2020); *Sadeqi v. LaRose*, 809 F. Supp. 3d 1090, 1093 (S.D. Cal. 2025); *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023).

*Sierra*, like *Barrera-Echavarria*, addressed post-order detention of an inadmissible alien, and it predates *Clark v. Martinez*. *Ibarra-Perez* and *Mamedova* predate *Padilla*; to the extent they rest on the premise that *Thuraissigiam's* limitation reaches detention, *Padilla* forecloses that premise. The Court finds the contrary line of decisions more persuasive.

For these reasons, the Court rejects Respondents' contention that Petitioner falls within the narrow category of persons covered by the entry fiction and on that basis lacks any due process right to challenge his detention. Respondents' Supplemental Response rests entirely on that contention. Respondents do not argue in the alternative that, if Petitioner has a due process right against arbitrary detention, the procedures he has received satisfy it, or that his detention remains reasonable.

## IV. Petitioner's Detention Has Become Unreasonably Prolonged

Having determined that Petitioner's detention is subject to due process protection, the Court must analyze what process is due. Courts in this Circuit assess whether § 1225(b) detention has become unreasonably prolonged by weighing six factors: (1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays caused by the government; and (6) the likelihood that the proceedings will end in a final order of

removal. *Banda*, 385 F. Supp. 3d at 1117-18; *see Kaur*, 2026 WL 967846, at *4. *Banda* applied these factors to an asylum seeker held under § 1225(b)(1) for more than seventeen months and held that unreasonably prolonged detention without a bond hearing violates due process. *Banda*, 385 F. Supp. 3d at 1105, 1118-20.[8]

**A. Length of Detention**

Length of detention is the most important factor. *Banda*, 385 F. Supp. 3d at 1118. Petitioner has been detained since December 18, 2024, more than twenty-one months. Courts have found shorter periods sufficient. *See id.* at 1118-19 (17 months); *Kaur*, 2026 WL 967846, at *4 (15 months). This factor weighs strongly in Petitioner's favor.

**B. Likely Future Detention**

Petitioner's BIA appeal has been pending since October 2025. The BIA accepted it as timely on November 10, 2025, but as of the filing of the Petition it had not set a briefing schedule. (Doc. 1-1 at 46; Doc. 1 ¶ 27.) An adverse decision would permit a petition for review and a stay motion in the Ninth Circuit, extending detention by an untold number of months or years. A favorable decision would likely mean further proceedings on remand. And even a final order would not permit removal to Benin, because DHS did not appeal the grant of CAT deferral. (Doc. 1-1 at 36.) Respondents have identified no third country to which Petitioner could be removed. This factor favors Petitioner.

**C. Conditions of Detention**

Petitioner is held at the Eloy Detention Center, which is operated by CoreCivic. (Doc. 1-1 at 21, 29.) His hospital records describe him as a "Correctional Facility Inmate" brought from the "Eloy correctional facility" (Doc. 1-1 at 19) and as presenting to the emergency department "from jail" (*id.* at 25). He is handcuffed and shackled when transported for outside medical care. (Doc. 1 ¶ 34.) The unrebutted medical evidence shows that he has at times gone without his blood pressure medications, that his diet is not suited to his hypertension and kidney disease, and that he was hospitalized for hypertensive emergency with acute renal failure. (Doc. 1-1 at 9, 18.) The records also reflect periods of

[8] *Banda* predates *Thuraissigiam*, but its reasoning depends on no proposition *Thuraissigiam* rejected. Respondents do not address these factors.

better control. (*Id.* at 21-22.) Still, conditions that resemble penal confinement and expose a detainee with serious chronic illness to these risks weigh in favor of a hearing. *See Jones v. Blanas*, 393 F.3d 918, 932-34 (9th Cir. 2004); *Kaur*, 2026 WL 967846, at *5-6. This factor favors Petitioner.

**D. Delays Caused by Petitioner**

Petitioner has caused no delay. He filed his asylum application about six weeks after he was served with the NTA (Doc. 1 ¶ 23), and his merits hearing took place nine months after his apprehension (Doc. 1-1 at 33). Pursuing an administrative appeal is the exercise of a statutory right, not dilatory conduct. *See German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020). This factor favors Petitioner.

**E. Delays Caused by the Government**

The Court does not find bad faith. But the record does not reflect that the BIA has set a briefing schedule since it accepted Petitioner's appeal, and DHS has not acted on his parole request. (Doc. 1-1 at 46; Doc. 1 ¶¶ 27, 66.) That delay is not attributable to Petitioner. This factor weighs in Petitioner's favor.

**F. Likelihood of a Final Order**

Petitioner passed credible-fear screening, and the IJ found him credible and eligible for asylum but for the material-support bar. (Doc. 1 ¶¶ 24-25.) His appeal challenges the application of that bar to a ransom payment made to secure his release from kidnappers. (Doc. 1-1 at 41-43.) The Court expresses no view on the merits. But even if a final order issues, the unappealed grant of CAT deferral means Petitioner cannot be removed to Benin, and Respondents have identified no alternative. The link between continued detention and effectuating removal is correspondingly attenuated. This factor favors Petitioner or, at minimum, is neutral.

Every factor favors Petitioner or is neutral, and the most important factor weighs heavily in his favor. Petitioner's detention has become unreasonably prolonged.[9]

[9] The same conclusion follows from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which the Ninth Circuit has applied in the immigration detention context. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022) (assuming without deciding that *Mathews* governs a due process challenge to prolonged detention under 8 U.S.C. § 1226(a));

**V. Remedy**

The appropriate remedy is an individualized bond hearing before a neutral decisionmaker. Petitioner already received that hearing, and the IJ determined Petitioner should be released on $8,500 bond. (Doc. 1-1 at 48.) Respondents will be required to release Petitioner under this alternative bond determination.[10]

**IT IS THEREFORE ORDERED** that the Petition for Writ of Habeas Corpus

---

*Hernandez*, 872 F.3d at 993-95 (applying *Mathews* to bond determinations under § 1226(a)). First, Petitioner's interest in freedom from physical confinement is the most fundamental liberty interest, *Zadvydas*, 533 U.S. at 690, and it grows with each month of detention. His serious medical conditions make that interest weightier still. Second, the risk of erroneous deprivation without a hearing is high. No decisionmaker with authority to release Petitioner has ever assessed whether he poses a flight risk or a danger. The only neutral decisionmaker to consider the question, the IJ, concluded that he lacked jurisdiction and stated that he would otherwise grant bond. (Doc. 1-1 at 48.) Parole under § 1182(d)(5)(A) is a discretionary decision by the detaining agency, with no hearing, no record, and no review. The record does not show that ICE has ever conducted a parole review, and Petitioner's parole request has gone unanswered. (Doc. 1 ¶ 66.) The contrast with the annual, counseled, evidentiary reviews in *Barrera-Echavarria* is stark. 44 F.3d at 1450. Third, the government's interests in securing Petitioner's appearance and protecting the community are legitimate, but a bond hearing serves them. Immigration judges conduct such hearings routinely under § 1226(a), and an IJ has already heard this matter once, so the administrative burden is modest. Nor does a hearing intrude on the admission decision, which remains with the immigration courts. On balance, due process requires an individualized bond hearing.

[10] The relief ordered in this case is consistent with decisions from numerous other courts. *See In re Rojas*, No. 2:25-CV-02548-RFB-BNW, 2026 WL 125152, at *2 (D. Nev. Jan. 16, 2026) ("Petitioner requested a custody redetermination (bond) hearing before the immigration court, and on December 16, 2025, Immigration Judge Lindsy Roberts denied Petitioner release on bond for lack of jurisdiction under *Hurtado*, holding in the alternative that if *Hurtado* did not deprive the immigration court of jurisdiction, release on bond in the amount of $2,500 plus alternatives to detention at the discretion of DHS would be appropriate. Respondents are ORDERED to release Petitioner from custody by 5:00 p.m. on January 16, 2026. Petitioner shall be subject to the bond and other conditions imposed by the IJ." (cleaned up)); *Diaz-Cruz v. Dedos*, No. 1:25-CV-01117-MLG-JMR, 2025 WL 3628517, at *2 (D.N.M. Dec. 12, 2025) ("Accordingly, the Court hereby orders that Respondents immediately release Diaz-Cruz upon payment of the $12,000 bond found in the alternative by IJ Odell."); *Ortiz Martinez v. Wamsley*, No. 2:25-CV-01822-TMC, 2025 WL 2899116, at *2 (W.D. Wash. Oct. 10, 2025) ("Concerning the remaining Petitioners, Respondents do not object that Lopez-Lopez is a member of the Bond Denial Class. Although that same day an IJ had denied Lopez-Lopez's bond based on an asserted lack of jurisdiction under section 1225(b)(2), the IJ found in the alternative that it would grant bond in the amount of $5,000 if it had jurisdiction. Respondents thus conceded that if the Court were to grant habeas relief to Lopez-Lopez, the appropriate relief would be either a bond redetermination hearing under 8 U.S.C. § 1226(a) or release upon payment of the bond found in the alternative by the IJ." (cleaned up)); *Guzman Alfaro v. Wamsley*, No. 2:25-CV-01706-TMC, 2025 WL 2822113, at *8 (W.D. Wash. Oct. 2, 2025) (ordering respondents to—within seven days of the order—release the petitioner "from detention or allow [her] release upon payment of the bond amount found in the alternative by the Immigration Judge in his [previous] order").

(Doc. 1) is **GRANTED** in part as to Count I and is otherwise denied.

**IT IS FURTHER ORDERED** that Respondents must immediately release Petitioner from custody upon payment of the $8,500 bond and subject to the conditions set in the Immigration Judge's April 15, 2026 alternative bond determination.

**IT IS FURTHER ORDERED** that at the time Petitioner is released, Respondents must return any and all personal property seized from Petitioner.

**IT IS FURTHER ORDERED** that Respondents must provide a notice of compliance within two days of this Order.

**IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 26th day of October, 2026.

Honorable Diane J. Humetewa
United States District Judge